## Oliver v. Muncy et al.

(Decided Dec. 11, 1935.)

(As Modified on Denial of Rehearing Jan. 28, 1936.)

J. R. LLEWELLYN and STEPHEN D. PARRISH for appellant.

G. MURRAY SMITH and D. ANDREW SHEARARD for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

This is an action to recover real estate and damages for being deprived of its use as a residence and as a place of business, and for injunctive relief.

Rena Oliver alleges that she is the owner, both by paper title and prescription, of lot No. 6, in the Lester addition, Berea, Madison county, Ky., and occupied it as a residence and conducted therein lodging rooms for tourists, and used in connection therewith a driveway leading from the front passing her residence; that the adjoining lot No. 5 was owned and occupied by Hezekiah and John Muncy, and that they had entered upon her driveway on lot No. 6, and erected a fence therein, thus depriving her of the use and enjoyment of it in connection with the residence used both as a home and in the business of renting rooms to tourists. She prayed that she be adjudged to be the owner of lot No. 6, the driveway thereon, and for a mandatory injunction requiring the Muncys to remove the fence which they had erected in the driveway on her lot, and for damages.

The Muncys traversed her petition and further alleged that Hezekiah Muncy owned lot No. 5, adjoining Oliver's, and that the fence of which she complained was entirely on his lot, and that in building it John Muncy simply acted as a servant of Hezekiah. Rena Oliver tendered two amendments to her petition. The averments therein were evidentiary. The facts alleged were admissible under the general issue. The court sustained a motion to strike the greater portion thereof. The facts alleged therein being admissible under the general issue, she was nowise prejudiced by the action of the court striking the same. Her reply to the Muncys' answer completed the issues.

It is entirely unnecessary to reproduce the evidence of the parties to consider properly and fairly dispose of the case. Prior to 1906, the Lesters owned a tract of land and sold and conveyed of it to the Louisville & Nashville Railroad Company a right of way. They later subdivided a portion of the remainder into lots, known in this action as "Lester's addition." Lot No. 6, of the subdivision, on the 22d day of October, 1906, was conveyed by the Lesters to William Shockley. It is a parallelogram, 85 by 200 feet. At the time it was conveyed to Shockley, there was still standing at each of the four corners of lot No. 6 the stakes which were planted at the time the subdivision was made. Shockley entered upon it; built a residence, 8½ feet from the line between it and lot No. 5; constructed a concrete walk of cement blocks, 5 feet in length, along the entire frontage of the 85 feet; erected a fence of post and wire, beginning at the terminus of the sidewalk at the corner of lots No. 5 and No. 6, running with the line thereof, passing about 8½ feet of the wall of the residence; and established a driveway on the inside of the fence, leading by the residence. The fence as constructed by Shockley remained for more than fifteen consecutive years, and until the posts decayed. At the terminus of the sidewalk at the corner of lots No. 5 and No. 6, a large post was set by Shockley and used in the construction of the fence. While it was still standing, an iron pin was driven in the ground by it. It remained until after this controversy originated. The driveway as constructed by Shockley was used for the benefit of his residence, and has been continuously used for like purpose by those who have derived their title from him, including Rena Oliver, until the Muncys constructed the fence which caused this litigation. Shockley's, the intervening grantees', and Rena Oliver's deed describes lot No. 6, thus:

> "Beginning at a point on the north side of Chestnut Street 40 feet west of the L. & N. right of way, thence N. 1½ W. 200 feet, thence N. 87½ E. with

Chestnut Street 85 feet to the beginning corner." In 1922, an iron pin was planted by the Louisville & Nashville Railroad Company in the line of its right of way. The measurement which precipitated this litigation was made by the Muncys, from this pin to the point at which 40 feet plus 85 feet end. The railroad company's right of way was surveyed after lot No. 6

was conveyed to Shockley, and, of course, after he had erected his residence, constructed the front sidewalk, side fence, and established his driveway. Its survey was made and the pin driven without regard to the whereabouts of either the corner or the dividing line of lots No. 5 and No. 6, and without regard to the beginning point for which Shockley deed called. The only thing authorizing and justifying this iron pin to be regarded as the beginning point called for in the Shockley deed is its presence in the right of way of the railroad company. The plat or map of the Lester subdivision shows the width and length of lots 1, 2, 3, 4, 5, and 6, fronting on Chestnut avenue. It is perfectly apparent that the corners or lines thereof, and the front footage, may or can be located accurately, and with more certainty than the corner of 5 and 6 can be located by merely measuring from the iron pin in the railroad company's right of way to a point at which 40 feet plus 85 terminate. If it be conceded that the iron pin in the railroad company's right of way is the identical beginning point called for in the deeds to lot No. 6, under which Rena Oliver claims title, still inasmuch as the large fence post, the iron pin planted thereat, and the end of the 85-foot concrete walk constructed by Shockley, are, and have been continuously, since the date of the Shockley deed, visible and recognized objects at the recently disputed corner of lots No. 5 and 6, when measuring the distance from the iron pin in the railroad company's right of way to these objects, the distance should give way to those existing and recognized objects.

It is the contention of the Muncys that when the Rena Oliver lot is surveyed by the boundary contained in her and Shockley's deed, using the iron pin in the right of way of the railroad company, as the object called for as the starting point, the 2½ feet in dispute on the line between his and Oliver's lots is outside of Oliver's and inside of his (Muncy's). In testifying, he and his son were equivocal as to whether the fence they had erected on the line of his lot was within the driveway as it had been constructed and used by Shockley, Rena Oliver, and those under whom she claims paper title. They were likewise indefinite as to whether the fence they had erected was 2½ feet of the end, or in the middle, of the first concrete block of the sidewalk constructed by Shockley in front of lot No. 6. They admit the presence of the driveway, the use thereof by

the owners of lot No. 6, and of the fence between it and the Muncy lot, at the time Muncy acquired paper title to his lot.

Hezekiah Muncy acquired deed to his lot in 1911. He built the fence now in dispute in 1932. As to the presence of the old fence, the whereabouts of the Oliver driveway, and the end of the Shockley concrete walk in front of the Oliver lot, at the time he acquired title to his lot and located as contended for by Rena Oliver, he was asked and answered thus:

"Q. Before that time and when you bought that property, tell the jury whether or not there was a fence there? A. There was an old fence when I bought my lot.

"Q. How long has it been gone? A. About 10 years. * * *

"Q. At the point up here next to Chestnut Street, is it not a fact that you set a post at the end of the fence about middleways of the concrete block of pavement and not at the joint? A. I do not know where it is on the block of cement.

"Q. Never looked at it? A. No. * * *

"Q. When you bought the piece of land from John Welsh that wire fence was there running from the street right back there, running from the west side? A. Yes.

"Q. You know that the person who owned it on the other side was in possession of the house and lot? A. Yes.

"Q. At the time you bought that land there, you knew that there was a driveway on the east side of that fence, down through there to the basement of that house? A. A real narrow driveway, delivered some coal down there and hit the fence and house.

"Q. They did haul coal through there? A. Yes and hung up."

Respecting the same topics, John Muncy was asked and answered thus:

"Q. Do you know of an old fence that use to be between those two lots? A. Yes.

"Q. How long has it been gone? A. 10 or 12 years. * * *

"Q. That fence was standing there at the time your father built the house on the lot and at the time he bought the lot? A. Yes. * * *

"Q. Did you help dig them (the post holes in which your father set posts when he built the fence in 1932)? A.. Yes.

"Q. Was there gravel on the driveway where you dug the holes? A. Yes.

"Q. How far out in the gravel? A. 5 or 6 inches, varied some.

"Q. Tell the jury whether or not you ever saw a kind of rotted stump standing up a foot or two feet high up against the north side of the pavement after Mrs. Oliver bought the lot and moved on it? A. A post stood there. It was a great tall post. * * *

"Q. When it was taken down there was a steel rod about in the place where it was pulled up? A. I don't know.

"Q. Did you see a steel rod there? A. I saw a steel rod on my father's side (according to the line of the Oliver lot beginning at the steel rod in the line of the right of way of the L. & N. R. R. Co.).

"Q. Are you not the one that pulled that iron rod that was driven there by the pavement? A. No.

"Q. Did you see it pulled up before it was pulled up? A. Yes.

"Q. How far from the joint in the concrete pavement? A. I cannot tell you, probably two or three feet from where the fence is now."

It is very clear that the answers to the foregoing questions establish that the disputed strip at the date of the Muncys' deed to lot No. 5 and continuously was and has been in the actual, open, adverse possession of the owners of lot No. 6 since Shockley entered thereon. It is permissible under the general issue in such case to establish champerty. Jones v. O'Connell, 237 Ky. 219, 35 S. W. (2d) 290.

The Muncys, notwithstanding they testified as shown by the above answers, claim that the fence which they had erected was located exactly where the old fence formerly stood and that no portion of it was in Oliver's driveway. Rena Oliver, in contradiction of this line of testimony, endeavored to establish by witnesses that the fence which the Muncys had erected would not permit a wagon to pass between it and the Oliver residence. She also tendered a plat of the Lester subdivision, showing the location of the Oliver, Muncy, and other lots, fronting on the same avenue. The court admitted this plat only as it showed the Oliver and Muncy lots, and excluded it for all other purposes. She retained an exception to the above ruling of the court.

The testimony of witnesses showing that after the Muncys had erected a fence, a wagon could not pass between it and the Oliver residence, was competent as contradictory of the testimony that the fence which they had erected was at the same place of the old fence. The plat of the subdivision was competent, and it was for the jury to attach such weight to it as it deemed proper in its discretion. It was clearly competent for Rena Oliver, after introducing the map, to follow it up with evidence, if she could, showing the natural objects on the adjoining lots in the subdivision, if there were such, or the recognized and agreed corners thereof, if there were such, and that when either her lot or the Muncy lot, or both, were measured according to it and such natural or agreed objects to the lots shown on the map, that the lot of either or both of them contained the frontage covered by their respective deeds, and that the disputed strip was within or not in her boundary. The court's exclusion of the map of the subdivision necessarily excluded such other evidence.

As we have indicated, Muncy's deed was champertous, and on this ground alone she was entitled to a directed verdict had she asked it.

Mrs. Oliver in her brief criticizes the instructions of the court. An examination of the motion and grounds for a new trial disclose that she did not rely on objections to the instructions as grounds for a new trial. Hence, we are precluded from reviewing them.

It is very plain that the court erred in refusing to admit the evidence hereinbefore discussed. The ver-

aict of the jury is palpably against the weight of the evidence. On these grounds the judgment is reversed, with directions to award her a new trial consistent herewith.